UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
)
)
)
IN RE AVEO PHARMACEUTICALS, INC.   )
SECURITIES LITIGATION             )         Civil Action No. 13-11157
)
)
_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                            **November 14, 2017**

## I.  Introduction

This is a putative class action in which the lead class action plaintiffs Robert Levine and

William Windham ("Plaintiffs") allege that Defendants AVEO Pharmaceuticals, Inc. ("Aveo"), its

former President, Chief Executive Officer and Director Tuan Ha-Ngoc ("Ha-Ngoc"), Chief

Financial Officer David N. Johnston ("Johnston"), Chief Medical Officer William Slichenmyer

("Slichenmyer") and co-Founder and Director Ronald DePinho ("DePinho")

(collectively "Defendants"), violated Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder, 15 U.S.C. § 78j(b) ("Count I"), and Section 20 of the Exchange Act, 15

U.S.C. § 78t ("Count II").  Plaintiffs have moved for class certification.  D. 145.  Defendants do

not dispute class certification, D. 154 at 5, but do dispute the class period proposed by Plaintiffs.

For the reasons set forth below, the Court ALLOWS Plaintiffs' motion for class certification under

Fed. R. Civ. P. 23(b)(3) and accepts the class period as proposed by Plaintiffs.

## II.  Factual Background

Unless otherwise noted, the facts recited here are as alleged in the operative, third amended

complaint ("TAC").  Plaintiffs are shareholders of Aveo, a "biopharmaceutical company focused

on discovering, developing, and commercializing cancer therapies." D. 117, ¶¶ 1–2. Plaintiffs have brought this class action suit on behalf of "all persons other than defendants who purchased AVEO common stock between May 16, 2012 and May 1, 2013." Id., ¶ 1. Aveo's lead product is tivozanib, an oral inhibitor of the vascular endothelial growth factor receptors. Id., ¶ 2.

After completing a Phase 2 trial for tivozanib and having End-of-Phase 2 meetings with the FDA about a Phase 3 trial, D. 117, ¶ 63, Aveo began the Phase 3 trial for tivozanib ("TIVO-1") in February 2010. Plaintiffs allege that Defendants included a number of defects in the design of TIVO-1, all of which contributed to unreliable results. D. 117, ¶ 68. In May 2012, Aveo, as alleged, had sufficient data from TIVO-1 to be aware of a trend of higher death rates ("overall survival") among tivozanib patients than control patients. D. 117, ¶ 80. On May 11, 2012, Aveo had a meeting with the FDA prior to filing its new drug application ("NDA"). D. 117, ¶ 81. At that meeting, the FDA expressed concern about the negative overall survival trend in TIVO-1 and further that TIVO-1's design made it unclear whether the results were because tivozanib was in fact toxic and recommended that Aveo conduct a second study prior to filing an NDA. D. 117, ¶ 83.

On May 16, 2012, Aveo issued a press release announcing positive findings from TIVO-1, including the trial's overall survival results, without referring to the FDA's prior concerns, and encouraging the market to view the data as "preliminary" and/or caused by distorting effects. D. 117, ¶ 88. Similar communication of preliminary TIVO-1 results was repeated by Aveo, Ha-Ngoc and Slichenmyer at a presentation at the American Society of Clinical Oncology on June 4, 2012, including an expression by Slichenmyer that the FDA would not be concerned by the geographic mix of patient sites, which had ultimately been concentrated in Central and Eastern

Europe to reduce cost, contrary to prior Aveo disclosures that stressed the importance of "geographically dispersed" test sites to TIVO-1's success.  D. 117, ¶¶ 68, 92.

In or around July 2012, Aveo decided to pursue a second clinical trial and informed the FDA of its decision.  D. 117, ¶¶ 95-96.  Aveo's public filings during the class period did not disclose the FDA's preference for a second trial, when prior to the class period it had speculated that a single trial would be sufficient.  D. 117, ¶ 100.  On August 2, 2012, Aveo issued a press release announcing its second quarter 2012 results, and disclosed that the FDA had expressed concern about overall survival trends in TIVO-1, but that Aveo was conducting "additional analyses" that would better contextualize the data in support of its NDA.  D. 117, ¶ 97.  Johnston shared similar information in multiple conferences, stating that while the FDA had expressed concern about the overall survival trend, analysis was being done to address the FDA's concerns.  D. 117, ¶¶ 106, 111, 114, 120.  In December 2012, Aveo received a letter from the FDA reiterating its concern that the overall survival trend was "a significant safety concern."  D. 117, ¶ 123.  At other conferences during the class period, Defendants described the overall survival results in TIVO-1 as superior to other competitive treatments, and described the four percent gap in overall survival between tivozanib and the control as not statistically significant.  D. 117, ¶¶ 124, 140.  On January 23, 2013, Aveo raised about $53.6 million in a public offering.  D. 117, ¶ 127.

On February 13, 2013, Slichenmyer disclosed the additional analyses and final overall survival data on an investor conference call, stating Aveo's expectation that this data would be "a subject of discussion" at the ODAC panel meeting.  D. 117, ¶ 128.  Slichenmyer further stated that while he could not discuss details of Aveo's discussions with the FDA, they were working to "address lots of questions they're sending to us" and expressed his own optimism at their chances

of approval.  D. 117, ¶ 130.  The same final overall survival data was again disclosed as a part of

Aveo's Form 10-K annual report for 2012.  D. 117, ¶ 135.

At the end of August 2012, the FDA sent Aveo a response to its proposed study protocol

for a second trial, disagreeing with the design.  D. 117, ¶ 109.  Aveo informed the FDA that it

would cancel the meeting that had been scheduled to discuss this proposed study.  D. 117, ¶ 110.

On September 28, 2012, Aveo issued a press release announcing that it had filed an NDA, which

it did without completing a second study.  D. 117, ¶¶ 87, 117.

On April 30, 2013, before the market opened, the FDA released the briefing materials it

had shared with the Oncologic Drugs Advisory Committee ("ODAC").  D. 117, ¶ 144.  The

briefing materials stated that at the May 2012 pre-NDA meeting between Aveo and the FDA, the

FDA had expressed concern about the overall survival trend and that it had recommended Aveo

conduct a second trial in a population comparable to that of the United States.  D. 117, ¶ 144.  The

briefing materials stated that TIVO-1 had concentrated its study sites in Eastern Europe and that

this might mean trial patients had different standards of care and practice patterns than they would

have in the United States.  D. 117, ¶ 145.  The briefing document also cast doubt on Defendants'

explanation for the overall survival data, which sought to discount the long-term risks of tivozanib

use, and that competitor treatments for renal cell carcinoma had overall survival data that favored

approval.  D. 117, ¶ 146.  That day, Aveo's shares fell 31.31%.  D. 117, ¶ 147.

On May 2, 2013, the ODAC panel held its hearing, which was focused on addressing the

FDA's concerns about the TIVO-1 overall survival data.  D. 117, ¶ 148.  A panel member pointed

out, and Slichenmyer confirmed in response, that the negative trend in overall survival should have

been apparent within six months of treatment.  D. 117, ¶ 149.  Other ODAC panel members

criticized the TIVO-1 design because it prevented the FDA and the panel from relying on the data

to conclude whether the overall survival data was innocuous or, for example, due to tivozanib's toxicity.  D. 117, ¶¶ 158-59.  Slichenmyer stated at the ODAC hearing that that Aveo had not initially included treatment crossover in its design of TIVO-1 as presented to the FDA and that it was added later without consulting the FDA.  D. 117, ¶ 160.  All but one of the ODAC panel members voted against recommending tivozanib's approval, concluding that the possibility an overall survival rate lower than the control would not be defensible to potential patients, and that TIVO-1's design was "inadequate." D. 117, ¶ 164.  That day, Aveo's shares fell almost fifty percent.  D. 117, ¶ 165.

## III.    Procedural History

Plaintiff Paul Sanders filed a class action complaint on May 9, 2013.  D. 1.  Plaintiffs subsequently filed the first amended complaint, D. 49, but the Court allowed Defendants' motion to dismiss that pleading without prejudice on March 20, 2015.  D. 75.  Plaintiffs filed a second amended complaint on April 17, 2015, D. 76-1.  On November 18, 2015, the Court allowed Defendants' motion to dismiss the second amended complaint and judgment was entered for Defendants.  D. 91; 92.  Plaintiffs later moved to set aside that judgment, relying upon newly discovered evidence from a complaint filed by the SEC.  D. 96.  The Court allowed the motion and vacated the judgment.  D. 110.  Plaintiffs filed the third amended complaint ("TAC"), the operative complaint, on February 2, 2017.  D. 117.

## IV.    Discussion

### A.    <u>Burden of Proof and Standard of Review</u>

Plaintiffs move for class certification pursuant to Fed. R. Civ. P. 23(b)(3).  Plaintiffs seek to certify a class of all people and entities (with some exclusions) that purchased Aveo common stock between May 16, 2012, and May 1, 2013, inclusive of those dates.  D. 145 at 1.

A class action may be certified only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a); In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008). Where, as here, the putative class has moved to certify under Fed. R. Civ. P. 23(b)(3), the Court must also determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3); Motor Vehicles, 522 F.3d at 18.

Although "the district court must undertake a 'rigorous analysis' to determine whether plaintiffs me[e]t the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites," In re Nexium Antitrust Litig., 777 F.3d 9, 17-18 (1st Cir. 2015) (quoting Comcast Corp. v. Behrand, 569 U.S. 27, 33 (2013)), "it should inquire into the merits of the action only 'to the extent that the merits overlap the Rule 23 criteria,'" In re Celexa & Lexapro Mktg. & Sales Practices Litig., 315 F.R.D. 116, 121 (D. Mass. 2016), leave to appeal denied sub nom. In re Celexa & Lexapro (D. Mass. June 17, 2016) (quoting In re Bos. Sci. Corp. Sec. Litig., 604 F.Supp.2d 275, 281 (D. Mass. 2009)).

Here, Defendants do not dispute certification of the class, D. 154 at 5, except as to the time period proposed by the Plaintiffs in the class definition. The Court, nonetheless, notes the basis for certifying the class under Fed. R. Civ. P. 23(a) and (b)(3).

**B.      Rule 23(a)**

      *1.      Numerosity*

To certify a class action, "the class [must be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Plaintiffs propose a class of Aveo shareholders estimated to be in the hundreds or thousands, measured by either extrapolation of Aveo's disclosed 88 holders of record.  Furthermore, in a securities class action, the class size may be reasonably inferred to be in the hundreds or thousands when there are "millions of shares outstanding and [] millions of transactions during the class period." In re Evergreen Ultra Short Opportunities Fund Sec. Litig., 275 F.R.D. 382,  388; see In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 22 (D. Mass. 2008).  Plaintiffs offer evidence showing both an average of 2,612,848 Aveo shares traded each week during the Class Period and that more than 43 million shares were outstanding during the Class Period.  On this record, the Court finds that Plaintiffs have satisfied the numerosity requirement.

      *2.      Commonality*

Plaintiffs must also demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Rule 23(a)(2) "does not require that every question be common" and even a "single common legal or factual issue can suffice." Swack v. Credit Suisse First Bos., 230 F.R.D. 250, 259 (D. Mass. 2005) (internal citations and quotation marks omitted).  Plaintiffs point to the alleged omissions by Aveo, scienter, loss causation and damages measurement as common issues of law and fact, because the statements Plaintiffs allege were misleading due to material omissions were made to all of the class members.  These issues have been considered sufficient to satisfy commonality, see In re Evergreen, 275 F.R.D. at 388-89 (collecting cases), and the Court concludes that they are sufficient here.

### 3. Typicality

Third, Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). In essence, "[t]ypicality requires that a 'class representative have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'" In re Evergreen, 275 F.R.D. at 389 (quoting Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071, 2003 WL 21672085, at *2 (S.D.N.Y. July 16, 2003)). Plaintiffs have satisfied typicality because all members of the class are purchasers of Aveo stock which they allege was inflated in price due to Defendants' material omissions and were harmed by the later revelations that cured the omission. See In re Bos. Sci. Corp. Sec. Litig., 604 F. Supp. 2d at 282.

### 4. Adequacy of Representation

Fourth, Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation is met by a two-part inquiry. "The moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). For the adequacy of class representatives, in a securities fraud class action, "the timing of class members' purchase and sale of the [] stock" does not create conflicts precluding classification if it is outweighed by "'the common interest in establishing misrepresentations made by defendants.'" In re Evergreen, 275 F.R.D. at 392 (quoting In re Baan Co. Sec. Litig., No. 1:98cv2465, 2002 WL 32307825, at *7 (D.D.C. July 19, 2002)). For the adequacy of class representatives, considering that Plaintiffs were Aveo shareholders alleged to have suffered losses caused by purchases of Aveo

stock at inflated prices due to Defendants' material omissions, they are adequate to serve as class representatives.  For the adequacy of counsel, the Court considers (i) counsel's work to identify and investigate the potential claims; (ii) counsel's experience in handling class actions or other complex litigation, as well as the specific claims in this case; (iii) counsel's knowledge of the relevant law; and (iv) the resources committed by counsel to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  Given their representation of the lead plaintiffs to date, Pomerantz LLP and Shapiro Haber & Urmy LLP, with substantial experience with securities class action litigation, are adequate to serve as class counsel.  D. 147-2; D. 147-3; see In re Evergreen, 275 F.R.D. at 392. Accordingly, the Court finds that Plaintiffs have satisfied these requirements.

### C.     Rule 23(b)(3)

Plaintiffs have moved to certify the class under Rule 23(b)(3), under which they must demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

#### 1.     Predominance

The focus of the predominance inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods. v. Windsor, 521 U.S. 591, 594, 623 (1997).  Defendants' only objection to class certification pertains to the class period running past April 29, 2013, given, as they contend, that any alleged material omissions were corrected on the market on April 30, 2013.  This objection boils down to an objection "render[ing] it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants' alleged misrepresentations."  In re Fed. Nat. Mortg. Ass'n Sec. Derivative & "ERISA" Litig., 247 F.R.D. 32, 38 (D.D.C. 2008) (internal quotation marks omitted).

A purported class can establish a rebuttable presumption of reliance by all securities purchasers during the class period, otherwise known as the fraud-on-the-market presumption. See Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988).   To establish the fraud-on-the-market presumption, the purported class must show:   "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market,[1] and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."   Halliburton Co. v. Erica P. John Fund, Inc., __ U.S. __, 134 S. Ct. 2398, 2408 (2014) (citing Basic, 485 U.S. at 248 n.27).   The presumption may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."   Basic, 485 U.S. at 248. At least as to the confines of how the class period should be defined, Defendants only dispute "when the truth was revealed."   Defendants contend that the class period should end at April 29, 2013, the last day of trading before the FDA released the ODAC meeting briefing materials before the market opened, including a recommendation that Aveo conduct a second study.   Defendants argue that the class period should not extend to May 1, 2013 as proposed by Plaintiffs because statements Plaintiffs allege were made at the ODAC meeting on May 2 did not reveal new information to the market, but rather restated the truth that was already disclosed in the April 30 briefing materials.

---

[1] To argue that AVEO shares traded in an efficient market during the Class Period, Plaintiffs submitted sufficient evidence supporting each of the factors enumerated in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).   D. 146, at 18-22.   The Cammer factors include (1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S-3 Registration Statement; and (5) "a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price."   Cammer, 711 F. Supp. at 1286-87.

a)      The Court May Consider Defendants' Position as to Certification

Plaintiffs contend that Defendants' argument is out-of-bounds at the class certification stage. In particular, they contend that Defendants' position, whether it seeks to rebut reliance or loss causation, requires the Court to wade improperly into the merits. In Basic itself, 485 U.S. at 248, the Supreme Court, however, contemplated the possibility of the class period-limiting position that Defendants raise here when it anticipated that the presumption of reliance could be rebutted if it was shown that "news of the merger discussions credibly entered the market and dissipated the effects of the misstatements" thus severing the connection of "those who traded Basic shares after the corrective statements." Id.; see Halliburton, 134 S. Ct. at 2413-14 (noting that "if the plaintiff did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, then he could not be said to have acted in reliance on a fraud-tainted price"); Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 472 (2013) (noting that "in an efficient market, a misrepresentation's impact on market price is quickly nullified once the truth comes to light. Thus, a plaintiff whose relevant transactions were not executed between the time the misrepresentation as made and the time the truth was revealed cannot be said to have indirectly relied on the misrepresentation"). In other words, evidence of the truth entering the market and dissipating the misstatements or omissions would be an appropriate rebuttal to the fraud-on-the-market presumption with respect to the length of class period at the class certification stage, but that consideration of that evidence cannot stray into rebuttal of reliance or loss causation on the merits, but rather is limited to ascertaining whether particular proposed class members would be required to submit individualized proof of reliance by virtue of the markets' general receipt of the curative disclosure.

The Court finds Hayes v. MagnaChip Semiconductor Corp., No. 14-CV-01160-JST, 2016 WL 7406418, at *7–9 (N.D. Cal. Dec. 22, 2016), instructive.  In that case, the plaintiff's allegations pointed to misstatements and omissions in a company's financial statements as the basis for their securities fraud claim.  Id. at *7.  In a subsequent disclosure, the company stated that the financial statements "should not be relied upon."  Id.  The defendants in Hayes did not dispute the materiality of the alleged misstatements and omissions, nor did they challenge loss causation with their own expert evidence on stock price; rather, they argued that the fraud-on-the-market presumption should be rebutted for those purported class members who purchased shares after the date of this subsequent disclosure.  Id.  The court agreed, concluding that Basic and Amgen did not bind it on this issue.  Hayes, 2016 WL 7406418, at *8.  The court's holding in Hayes, 2016 WL 7406418, at *7, did not turn on the fact that the disclosure came from the company itself and other courts have held that disclosures by third parties can be curative disclosures.  See, e.g., In re ORFA Sec. Litig., 654 F. Supp. 1449, 1465 (D.N.J. 1987).[2]

Plaintiff's reliance on Hatamian v. Advanced Micro Devices, Inc., No. 14-CV-00226 YGR, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016), and Burges v. Bancorpsouth, Inc., No. 3:14-CV-1564, 2017 WL 2772122, at *9 (M.D. Tenn. June 26, 2017), do not provide a basis for not considering Defendants' contention at this point.  Plaintiffs also rely on City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc., No. 12-5275, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015), which in addition to rejecting the defendants' argument in that case on price impact grounds, also rejected the defendants' rebuttal argument that any drop in stock price was caused

---

[2] Other cases decided before Amgen and Halliburton also support the Court's conclusion that consideration of curative disclosures to determine the appropriate class period is appropriate on a motion to certify a class.  See In re Fed. Nat. Mortg. Ass'n, 247 F.R.D. at 38-41; In re Nature's Sunshine Prod.'s Inc. Sec. Litig., 251 F.R.D. 656, 666–67 (D. Utah 2008); In re Corel Corp. Inc. Sec. Litig., 206 F.R.D. 533, 543-44 (E.D. Pa. 2002).

by an alternative cause, rather than the fraudulent cause alleged by the plaintiffs. <u>Id.</u> at *11-12. These cases are not analogous to the precise question presented here. For all of these reasons, the Court concludes that it is appropriate to consider Defendants' argument as it bears upon class certification.

b)      <u>The Court Accepts Plaintiffs' Class Period</u>

That having been said, the Court agrees with Plaintiffs. As alleged in the TAC, Plaintiffs plausibly allege for purposes of class certification that cure of the omissions in the market did not occur until the May 2, 2013 ODAC panel meeting. Accordingly, their theory is that purchasers who purchased stock before this time paid an inflated price, thereby injured, by Defendants' material omissions even if there were some partial cure by the April 30, 2013 briefing materials. Plaintiffs focus their allegations relating to the release of the presentation on issues relating to the request, and ignoring of that request, for Aveo to conduct a second study, as well as methodological criticisms relating to the location of study sites and the study's unproven hypothesis. D. 117, ¶¶ 144-146.

At the May 2 meeting, the FDA officials, in addition to areas covered by the presentation, focused on and discussed their concerns relating to the higher risk of death, or lower "overall survival," of test subjects in the TIVO-1 trial. D. 117, ¶¶ 148-164. The ODAC panel's materials, submitted by Defendants' in opposition to this motion and properly considered by the Court as incorporated by reference into the TAC, did contain some of the information characterized by the TAC as having been revealed at the ODAC meeting. For example, the graph reproduced in the TAC and described as having been "used at the ODAC panel" to reflect twenty-five percent potential increase in risk of death, D. 117, ¶¶ 148, 151, was present in the presentation materials released on April 29, D. 155-2 at 68. However, the ODAC members' responses to the presentation,

13

and their recommendation therefrom, were new information. As the title page of the briefing

document makes clear, "[t]he attached package contains background information prepared by the

Food and Drug Administration (FDA) for the panel members of the advisory committee."

D. 155-1 at 2. Moreover, the same title page stated that the FDA sought the ODAC panel's

"insights and opinions, and that the background package may not include all issues relevant to the

final regulatory recommendation and instead is intended to focus on issues identified by the

Agency for discussion by the advisory committee." Id. In other words, while some of the salient

data and study conclusions had already been revealed on April 29, the ODAC members' responses

to those materials, not produced by them, but to them, had not yet been made public and could not

be reasonably inferred by even scrupulous review of the briefing materials. Furthermore, after

Defendants had discussed the overall survival data as equivalent to competitor drugs, D. 117, ¶

140, the FDA in its presentation to the ODAC stated that no other drug approved for metastatic

renal cell cancer had the same "concerning issue," D. 117, ¶ 153. The possibility of market reliance

on a class-wide basis is reinforced by Plaintiffs' allegations that Defendants had been offering

positive and damage-minimizing characterizations of the overall survival rate data to the market,

see, e.g., D. 117, ¶¶ 97, 106, 111, 114, 120, 124, having already been informed by the FDA that it

considered overall survival in TIVO-1 "a significant safety concern," id., ¶ 123, and Defendants

stated their expectation that overall survival would be discussed at the ODAC meeting, id., ¶ 128.

In other words, by offering their own view of the outcome of the ODAC meeting as it

pertained to the likelihood of approval, Defendants created a link between approval, over which

any news was material to the market, and the actual outcome of the meeting. The FDA and ODAC

panel's full view of the NDA could not become clear to the market until the ODAC meeting,

generally the only forum in which the FDA publicly states its views on interactions with applicant

companies like Aveo or clinical trials.  Id., ¶ 52.  If disclosures "fail[] to convey the extent" of a piece of information, they cannot be considered curative for class certification purposes.  See Kasper v. AAC Holdings, Inc., No. 15-CV-00923-JPM-JSF, 2017 WL 3008510, at *13 (M.D. Tenn. July 14, 2017).

Accordingly, Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement as to the class period.

### 2.     Superiority

Rule 23(b)(3) also requires the Court to find that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  In assessing the superiority of a class action, the Court considers the following factors: (A) interest in "individually controlling the prosecution or defense of separate actions;" (B) "the extent and nature" of litigation involving class members arising out of the same controversy; (C) whether it is desirable or undesirable to concentrate the litigation in this forum; and (D) the "likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  Here, all four factors weigh in favor of certification.  In particular, the cost of individual actions would be prohibitive compared to an individual class member's recovery, and the burden on the courts, with a sizable class, would be significant.  See In re Evergreen, 275 F.R.D. at 393 (citing In re Bos. Sci. Corp. Sec. Litig., 604 F. Supp. 2d at 288; Swack, 230 F.R.D. at 273)).  Accordingly, Plaintiffs have satisfied Rule 23(b)(3)'s superiority requirement.

## V.     Conclusion

For the foregoing reasons, the Court ALLOWS Plaintiffs' motion for class certification, as that class and class period have been proposed, D. 145, under Fed. R. Civ. P. 23(b)(3).

**So Ordered.**

_/s/ Denise J. Casper_
United States District Judge